Filed 4/5/21  P. v. Reyes CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>JUAN CARLOS REYES,<br><br>       Defendant and Appellant. | B301357<br><br>(Los Angeles County<br>Super. Ct. No. TA143286) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Affirmed.

Law Office of J. Blacknell and Kellen I. Davis for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Juan Carlos Reyes (defendant) appeals his conviction, following a jury trial, of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and two counts of attempted murder without premeditation (§§ 664, 187, subd. (a)). As to each count, the jury found defendant personally used a firearm that caused great bodily injury or death. (§ 12022.53, subds. (c)-(d).)

The trial court found that defendant had two prior serious or violent felony convictions under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and under section 667, subdivision (a)(1) and sentenced him to prison for a term of 150 years to life, plus 36 years.

We affirm the judgment.

## STATEMENT OF FACTS

At approximately 9:00 p.m. on February 18, 2017, Ivan Merino was working at a taco truck parked at 135th Street and Alameda Avenue in the City of Compton. Merino was grilling meat on the sidewalk adjacent to the taco truck. Merino's coworker, Ana Granados, stood next to him on the sidewalk making tortillas. A taco truck customer, Sergio Ramirez, was standing a few feet away from Merino and Granados.

Merino and Granados both saw a sedan traveling southbound on Alameda Avenue stop near the taco truck then reverse. Merino saw at least two people in the sedan, one in the driver's seat and one in the front passenger seat. Merino and Granados then heard gunshots, and they both started running toward the front of the taco truck. Granados was struck by a bullet on her left calf. Merino was struck by a bullet on his left shin and fell to the ground. While on the ground, Merino saw a

---

[1] All further statutory references are to the Penal Code.

2

light-skinned person wearing a dark hoodie standing over Ramirez, who was lying on the ground. Merino saw several flashes coming from that direction.

Ramirez died at the scene from seven gunshot wounds. His body lay directly in front of the taco truck's outdoor grilling station. Eleven cartridge casings, all fired by the same weapon, were strewn throughout the street and sidewalk.

Karla Landeros testified that on the evening of February 18, 2017, she was in her Toyota Camry on 131st Street with her boyfriend, "Lucky," when she received a phone call from defendant. Landeros knew defendant by his moniker, "Scandalous." Defendant told Landeros he needed a ride and asked her to pick him up on Alameda Avenue and 134th Street. When Landeros and Lucky drove to that location, defendant entered the back seat of the Camry and told Landeros to turn right on 134th Street. Landeros assumed that she was taking defendant on a "dope run." Defendant was wearing a hoodie and sweat pants.

As Landeros proceeded on Alameda Avenue toward 135th Street, the Camry approached a taco truck. Defendant told Landeros to "hold on," as he was looking for someone. He directed Landeros to back up and then stop. When Landeros stopped, defendant exited the vehicle. Landeros did not see where defendant went, but she heard several gunshots before defendant returned to the car. She did not see defendant with a gun at any time.

When defendant returned to the car, he told Landeros to "Go, go, go" in a loud voice. Landeros made a right turn on Oris Street at the next corner, near an alley, where defendant told her to stop. Defendant got out of the car and told Lucky to get out

3

with him.  Defendant then told Landeros to park the car and that he would call her.  Landeros drove a bit, parked the car, and left the keys inside.  She then walked towards Stockwell Street.  Defendant telephoned Landeros shortly thereafter and said he was going to pick her up.

Eva Pelayo testified that defendant telephoned her on the night of February 18, 2017 and asked for a ride.  Pelayo was with her friend, Mayra Ruvalcava, at the time.  Ruvalcava drove her Dodge Durango, with Pelayo in the front passenger seat, to the intersection of Santa Fe and Pine Streets where they collected defendant.  Defendant, known to the women as "Scandalous," was wearing a hoodie.

At defendant's direction, Ruvalcava picked up Landeros at the intersection of Wilmington Avenue and Stockwell Street.  Landeros testified that when she entered the Dodge Durango, defendant told her not to say anything, or he would kill her.  Defendant then asked Landeros for her cell phone.  When Landeros handed defendant her phone, defendant broke the phone with his hands and then stepped on it.  Ruvalcava drove to a liquor store, a Jack in the Box, and a Shell gas station, and then dropped Landeros at Long Beach Boulevard and Tucker Street.

Cell phone records and cell phone tower information for phone numbers belonging to Landeros and defendant showed that both phones were in the vicinity of the crime scene when the shooting occurred.  Cell tower records showed that Landeros's phone subsequently went to the area near Stockwell Street and Wilmington Avenue and that both Landeros's phone and defendant's phone were in communication with each other within 30 minutes after the crime.

4

Surveillance video obtained from a camera at a nearby liquor store showed Ramirez ordering food from the taco truck and eating it at an adjacent table. The video showed a car drive past the taco truck stop, reverse, and stop again before the shooting occurred. The video also showed a person exiting the car and shooting Ramirez. Pelayo watched the video during a May 31, 2017 interview with detectives and identified defendant as the shooter, based on the shooter's build and clothing. At trial, however, Pelayo denied identifying defendant as the person in the video. Landeros watched the video during her testimony at trial and identified the car as her Camry and defendant as the shooter.

Landeros and defendant were both arrested for the crime. At some point after her arrest, Landeros was transported in a van together with defendant. While in the van, defendant told Landeros not to worry because the police would not find her car. He inquired about Landeros's family, asked whether they still lived in the same location, and said he would send people to "go look out." Landeros understood defendant to be threatening her family, and she was afraid.

After the jury convicted him, defendant filed a motion for a new trial, asserting ineffective assistance of counsel. Defendant claimed that before the trial he had informed his attorney about a dying declaration by Lucky, who was killed in an accident a few weeks after the shooting. According to defendant, Lucky told those present at the scene of his accident that he was "on the run" because he had killed someone. Defendant claimed to have provided his attorney with monikers for and descriptions of the otherwise unnamed persons who witnessed Lucky's dying declaration. Defense counsel told the trial court that he had

5

investigated the issue "to some extent" before trial and that he sent an investigator out after trial in an effort to locate the alleged witnesses.  The trial court denied the motion.

## CONTENTIONS ON APPEAL

Defendant raises the following contentions on appeal:

I.  The trial court violated defendant's right to confrontation of witnesses by limiting his cross-examination of Landeros, and specifically, whether the custody status of her children was a motivating factor for her trial testimony.

II.  The trial court erred by instructing the jury on the kill zone theory.

III.  The prosecutor committed misconduct by disregarding the trial court's evidentiary limitations on defendant's gang affiliation and past drug transactions.

IV.  The trial court's jury instruction on attempted murder erroneously included the natural and probable consequences doctrine, in contravention of Senate Bill 1437.

V.  Defendant was denied effective assistance of counsel at trial.

## DISCUSSION

## I.  Right to confrontation and cross-examination

"A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury with facts from which it could appropriately draw inferences regarding the witness's reliability. But not every restriction on a defendant's cross-examination violates the Constitution.  The trial court retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination.  Unless the defendant can show that the

6

prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation." (*People v. Sanchez* (2016) 63 Cal.4th 411, 450-451.)

A trial court also has broad discretion under Evidence Code section 352 to determine whether the probative value of evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.) We review for abuse of discretion defendant's claim that the trial court's restriction of the scope of cross-examination violated defendant's rights under the confrontation clause. (*People v. Peoples* (2016) 62 Cal.4th 718, 765.)

Defendant fails to establish any abuse of discretion. The record shows that defense counsel was permitted to cross-examine Landeros at length about a leniency agreement she entered into in exchange for her testimony at trial. Landeros testified that she had been arrested and charged with murder in this case, that she faced a potential sentence of life imprisonment, and that under the terms of the leniency agreement, she received a substantially reduced seven-year sentence in exchange for her testimony at trial. Defense counsel also elicited testimony from Landeros that during the weeks after the crime she was homeless, addicted to drugs, and feared for her life. Landeros testified that investigating detectives relocated her and helped her enter a drug treatment program and obtain temporary housing and money for food.

Defense counsel was allowed to question Landeros about her oldest child, who was in her legal custody but was being cared for by Landeros's parents. Defense counsel was also

7

allowed to ask Landeros whether her children were discussed during her initial meetings with detectives. Landeros testified that she did not believe cooperating with the detectives would benefit her and her children.

The trial court did not allow defense counsel to ask whether Landeros's oldest child was the subject of court supervised custody or whether any of her children had been freed for adoption. The court sustained a relevancy objection to those questions and found that line of inquiry to be more prejudicial than probative.

The trial court offered to revisit its ruling if defense counsel had evidence that detectives promised to help Landeros with custody issues if she cooperated. After reviewing the transcript of Landeros's interview with the detectives, the court found that no such promise had been made. The trial court rejected defense counsel's argument that Landeros's child welfare history was relevant to her credibility as a witness.

The record discloses no abuse of discretion. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination . . . not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) A trial court's exercise of its discretion to limit cross-examination does not violate the Sixth Amendment unless the defendant can show that the prohibited examination would have produced "'a significantly different impression'" of the witness's credibility. (*People v. Hamilton* (2009) 45 Cal.4th 863, 943.) Defendant fails to make such a showing.

## II. Alleged "kill zone" instructional error

The trial court instructed the jury as follows as part of its instruction on the crime of attempted murder:

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Ivan Merino and Ana Granados, the People must prove that the defendant not only intended to kill Sergio Ramirez but also intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Ivan Merino and Ana Granados or intended to kill Sergio Ramirez by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Ivan Merino and Ana Granados."

Defendant contends it was error for the trial court to give this instruction because the evidence was insufficient to support application of the kill zone theory of attempted murder.

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) Because direct evidence of intent to kill is rare, that intent must ordinarily be inferred from the actions and statements of the defendant and the circumstances surrounding the crime. (*Ibid.*) In *People v. Bland* (2002) 28 Cal.4th 313 the California Supreme Court endorsed the concept of a concurrent intent to kill as a permissible theory for establishing the specific intent required for attempted murder. (*Canizales, supra,* at

9

p. 603.)  The court in *Bland* applied what is commonly referred to as the "kill zone" theory of attempted murder.  Under that theory, the prosecution can attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the intent to kill an untargeted victim rose concurrently the intent to kill a primary target.  (*Canizales, supra,* at p. 603.)

In *Canizales, supra,* 7 Cal.5th 591, the Supreme Court held that the kill zone theory may be applied only when the following two-part test is satisfied:  "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm – that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death – around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm."  (*Id.,* at p. 607.)

The court in *Canizales* concluded there was insufficient evidence in that case that the defendants intended to create a zone of fatal harm, and it was error to instruct the jury on the kill zone theory.  (*Canizales, supra,* 7 Cal.5th at pp. 611-612.)  The evidence presented at trial in *Canizales* showed that the shooter fired five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away.  The attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would have limited means

10

of escape.  Neither the primary target nor the other alleged victim was struck by any bullet.  (*Id*. at p. 611.)

In contrast, the evidence in this case showed that defendant fired eleven shots into a targeted area.  The victims were all standing within a few feet of each other and their freedom of movement was constrained by the location of the taco truck.   All three victims were struck with a bullet.  Ramirez, the primary target, was shot seven times.

*People v. Cardona* (2016) 246 Cal.App.4th 608, on which defendant relies, is distinguishable.  The evidence in that case showed that while the defendant attempted to rob the victim at gunpoint at a backyard party, the victim stabbed the defendant, who then fired the gun five or six times.  Three bullets struck the victim and an additional bullet wounded a bystander at the party.  (*Id.,* at p. 611.)  The court in *Cardona* concluded the evidence showed the defendant's primary motivation was to defend himself, not to kill everyone near the primary target, and was insufficient to support a kill zone instruction.  (*Id.,* at p. 615.)

Here, unlike *Cardona,* self-defense was not an issue.  Rather, the evidence showed that defendant targeted Ramirez, firing eleven rounds in a specific area where Merino and Granados were also standing just a few feet away from Ramirez, defendant's primary target.  The trial court did not err by instructing the jury on the kill zone theory.

**III.  Alleged prosecutorial misconduct**

At a hearing outside the presence of the jury, the prosecutor raised evidentiary issues concerning defendant's possible gang affiliations and his involvement in past drug transactions.  Defense counsel objected that gang evidence was irrelevant and prejudicial.  The trial court deferred ruling on the

11

issue but stated its inclination to limit gang affiliation evidence to testimony by Landeros that she and the defendant had belonged to the same gang. The court noted that such evidence was relevant to Landeros's credibility because she would be testifying against a fellow gang member. The trial court also suggested any potential prejudice was reduced because defendant had visible tattoos covering his face and body. The trial court also deferred ruling on the admissibility of evidence concerning defendant's involvement in drug transactions, but indicated its inclination to limit Landeros's testimony concerning drug transactions with defendant to the night of the crime and her belief that she was driving defendant to a drug transaction.

The following day, the prosecutor asked the court to clarify whether Landeros could testify that she and defendant belonged to the same gang and that she had helped him with drug transactions in the past. The trial court responded that it would allow Landeros to testify about her gang membership with defendant but not about any prior crime.

At a subsequent hearing before Landeros testified, the trial court reiterated that Landeros could testify how she knew defendant, including their common gang membership. The court further stated that Landeros could testify that she believed she was driving defendant to a drug transaction on the night of the crime but she could not testify that she had done previous drug transactions or committed other crimes with defendant.

Landeros testified at trial that she had a Largo 36 tattoo because she had been a member of the Largo 36 gang until 2006. She further testified that she had known defendant for approximately six months at the time of the shooting and that he was a Largo 36 gang member. Landeros also testified, without

12

objection, that when defendant telephoned her on the night of the crime and asked her for a ride, she thought they were doing a "usual run because I did dope runs with him."

On redirect examination the following day, the prosecutor elicited the following testimony from Landeros, without objection:

"Q: Can you tell the jury exactly what you were using that particular night?

"A: Crystal meth.

"Q: And do you remember who you got that crystal meth from that particular night?

"A: I don't remember, sir.

"Q: Did you ever get crystal meth from the defendant?

"A: No, not that night.

"Q: How about prior to that? Did you ever get crystal meth from him?

"A: I don't remember, sir."

Defendant forfeited his claim that the prosecutor committed misconduct by exceeding the trial court's evidentiary limitations by failing to object to the allegedly improper questioning. "'A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) Defendant's objections, raised before Landeros was called to testify, to anticipated testimony about defendant's gang affiliation and prior drug dealing did not preserve his challenge to Landeros's actual testimony, allegedly elicited by the

13

prosecutor's failure to abide by the trial court's evidentiary limitations. (*Ibid.*)

## IV. Alleged instructional error in violation of Senate Bill 1437

### A. Senate Bill 1437

Senate Bill 1437, which became effective on January 1, 2019, was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) "Under the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state. [Citation.] ''The felony-murder rule impute[d] the requisite malice for a murder conviction to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to human life.'' [Citation.]" (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248 (*Lamoureux*).)

"Independent of the felony-murder rule, the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense. [Citation.] ''Because the nontarget offense [was] unintended, the mens rea of the aider and abettor with respect to

14

that offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'" [Citation.]" (*Lamoureux, supra,* 42 Cal.App.5th at p. 248.)

Senate Bill 1437 restricted application of the felony murder rule and the natural and probable consequences doctrine, as applied to murder, by amending section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, § 3.) Section 189, subdivision (e), as amended, provides that a participant in a specified felony is liable for murder for a death during the commission of the offense only if one of the following is proven: "(1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e).)

Senate Bill 1437 also limited section 188, the statutory provision that defines malice for purposes of murder. As amended, section 188 states in pertinent part: "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

## B. Senate Bill 1437 does not apply

Senate Bill 1437 does not apply. Defendant was prosecuted and convicted as the actual perpetrator of the murder and attempted murders, not as an aider or abettor or as the result of his participation in some other crime. The jury found that

15

defendant personally and intentionally discharged a firearm that caused death and great bodily injury.  The trial court did not instruct the jury on felony murder, aiding and abetting principles, or the natural and probable consequences doctrine.

Defendant acknowledges that the jury was not given a natural and probable consequences instruction.  His argument is premised on "natural and probable consequences" language in the definition of implied malice in the trial court's instruction on murder pursuant to CALCRIM No. 520:

> "The defendant is charged in Count One with murder in violation of Penal Code section 187.  To prove that the defendant is guilty of this crime, the People must prove that:
>
> "1.  The defendant committed an act that caused the death of another person
>
> "AND
>
> "2.  When the defendant acted, he had a state of mind called malice aforethought.
>
> "There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.
>
> "The defendant had *express malice* if he unlawfully intended to kill.
>
> "The defendant had *implied malice* if:
>
> "1.  He intentionally committed the act;
>
> "2.  The natural and probable consequences of the act were dangerous to human life;
>
> "3.  At the time he acted, he knew his act was dangerous to human life;

16

"AND

"4.  He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in Calcrim 521."

The foregoing instruction does not contravene Senate Bill 1437.  It has nothing to do with the natural and probable consequence doctrine of aiding and abetting a murder.  As one appellate court has noted:  "Although the instructions related to implied malice and the natural and probable consequences doctrine of aiding and abetting include similar language regarding a 'natural consequence,' they are distinctly different concepts.  Implied malice is a mental state for the commission of the crime of second degree murder, either by the principal or as an aider and abettor. . . .  Senate Bill No. 1437 changed the circumstances under which a person could be convicted of murder without a showing of malice, but it did not exclude from liability persons convicted of murder for acting with implied malice." (*People v. Soto*, 51 Cal.App.5th 1043, 1056-1057, review granted Sept. 23, 2020, S263939.)  We agree and conclude Senate Bill 1437 does not apply here.

## V. Ineffective assistance of counsel

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-694 (*Strickland*); see also Cal. Const., art. I, § 15.) It is the defendant's burden to demonstrate that trial counsel was inadequate and that prejudice resulted. (*Strickland, supra,* at pp. 686-694.) Prejudice is shown by "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.*, at p. 694.) We review an ineffective assistance of counsel claim de novo. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 725.)

Defendant contends his counsel rendered ineffective assistance by failing to investigate witnesses to a purported dying declaration by Lucky that he was "on the run" because he had killed someone. To show ineffective assistance based on an alleged failure to investigate, defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.)

The record here shows that defense counsel investigated Lucky's alleged dying declaration both before and after the trial. The post-trial investigation included retaining an investigator who attempted, unsuccessfully, to locate possible witnesses.

We need not, however, "'determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.'" (*People v. Cox* (1991) 53 Cal.3d 618, 656 [citing *Strickland, supra*, 466 U.S. at p. 697].) Assuming, but not deciding, that trial

18

counsel's investigation was deficient, we conclude that defendant suffered no prejudice. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . [¶] The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland,* at pp. 693-694.) Defendant fails to make that showing. Given the substantial evidence of defendant's guilt, including testimony by Landeros, defendant's accomplice; cell phone information placing defendant and Landeros at the crime scene; surveillance video of the murder; and Pelayo's pre-trial identification of defendant as the shooter in the surveillance video; there is no reasonable probability that the jury would have reached a different result.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

19